Filed 3/8/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JULIE SU, as Labor Commissioner, etc., | B275426 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC520278 |
| v. | |
| STEPHEN S. WISE TEMPLE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ernest Hiroshige, Judge. Reversed and remanded with directions.

David M. Balter for Plaintiff and Appellant.

Capstone Law, Melissa Grant and Ryan H. Wu for Clergy and Laity United for Economic Justice and Worksafe, as Amicus Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Jeremy B. Rosen, Felix Shafir and Joshua C. McDaniel; Liebert Cassidy Whitmore, Michael C. Blacher, David A. Urban, and Hengameh S. Safaei for Defendant and Respondent.

Eugene Volokh for the Fuller Theological Seminary and Profs. Richard Garnett, Mark Scarberry, and Gregory Sisk, as Amicus Curiae on behalf of Defendant and Respondent.

James A. Sonne for the General Conference of Seventh-Day Adventists and the Pacific Union Conference of Seventh-Day Adventists, as Amicus Curiae on behalf of Defendant and Respondent.

Stephanie N. Taub for First Liberty Institute, as Amicus Curiae on behalf of Defendant and Respondent.

Eric C. Rassbach for the Church of God in Christ and the Becket Fund for Religious Liberty, as Amicus Curiae on behalf of Defendant and Respondent.

Gibson, Dunn & Crutcher, Robert E. Dunn, Chelsea Mae Thomas and Daniel Lawrence Chen for the Union of Orthodox Jewish Congregations of America as Amicus Curiae on behalf of Defendant and Respondent.

Law Office of Michael L. Parker and Michael L. Parker; Thomas C. Berg; and Kimberlee Colby for Association of Christian Schools International, Christian Legal Society and American Association of Christian Schools, as Amicus Curiae on behalf of Defendant and Respondent.

———————————

# INTRODUCTION

This case was brought by plaintiff and appellant Labor Commissioner Julie Su (Commissioner) on behalf of preschool teachers employed by defendant and respondent Stephen S. Wise Temple (Temple). The Commissioner alleged that the Temple violated various provisions of the Labor Code by failing to provide its preschool teachers with rest breaks, uninterrupted meal breaks, and overtime pay. The trial court granted summary judgment in favor of the Temple, concluding the Commissioner's claims were barred by the "ministerial exception"—a constitutional doctrine that provides a complete defense to certain employment claims brought against religious institutions by or on behalf of persons classified as ministerial employees.

Although the Temple's preschool curriculum has both secular and religious content, its teachers are not required to have any formal Jewish education, to be knowledgeable about Jewish belief and practice, or to adhere to the Temple's theology. Further, the Temple does not refer to its teachers as "ministers" or the equivalent, nor do the teachers refer to themselves as such. Accordingly, we conclude the teachers are not "ministers" for purposes of the ministerial exception. We therefore reverse the judgment and remand for further proceedings.

# BACKGROUND

## 1. Facts

The Temple is a Reform Jewish synagogue, whose mission is to promote the Jewish faith and serve and strengthen the Jewish community. The Temple's Early Childhood Center (ECC), which employs approximately 40 teachers, is an on-site preschool for children five years of age and under.

The ECC's curriculum has a significant secular component. ECC teachers spend much of the school day engaged with children in indoor and outdoor play at various learning centers. These learning centers include blocks, puzzles, games, books, and science, and promote reading readiness, writing readiness, and math readiness. Teachers also work with children on social skills, including sharing and kindness, and assist with toileting, meals, and snacks.

The ECC's curriculum also has a religious component through which children are introduced to Jewish life, religious ritual, and Judaic observance. The religious curriculum includes the celebration of Jewish holidays, weekly Shabbat observance, recitation of the *ha-motzi* (grace before meals) before meals and snacks, and an introduction to Jewish values such as *kehillah* (community), *hoda'ah* (gratitude) and *shalom* (peace and wholeness). All ECC teachers participate in weekly Shabbat services and teach religious concepts, music, singing, and dance. The ECC is part of the Temple's religious and educational mission, and it fulfills a religious obligation of the Temple. The ECC exists to instill and foster a positive sense of Jewish identity and to develop in children favorable attitudes towards the values and practices of Judaism.

ECC teachers are not required to be adherents to the Temple's religious philosophy or, indeed, to be Jewish. As a result, while some of the ECC's teachers are Jewish, others are non-Jewish or do not identify with any faith tradition. For example, one former teacher was raised as a Catholic and, prior to taking a job at the ECC, was employed as a teacher and librarian at a private Catholic elementary school. Another teacher is a practicing Catholic; and yet another taught

4

catechism at a church. ECC teachers are not ordained as religious leaders and do not hold themselves out as ministers of the faith.

ECC teachers are not required to have any theological training, to be educated about Judaism, or to be proficient in Hebrew. As a result, some ECC teachers are hired without any knowledge of Jewish religion or practice. Once employed, they are not required to undertake a course of theological study. Instead, the ECC provides its teachers with Judaic reading materials, including the Temple's "holiday packets," which include explanations of each of the Jewish holidays and the symbols, Hebrew vocabulary, foods, and songs associated with those holidays. In addition, teachers receive guidance on religious observance from the ECC's rabbis and administrators trained in Jewish education.

## 2.    The Present Action

The Commissioner filed the present action in September 2013. The operative complaint alleges that the Temple classifies its non-credentialed teachers as "non-exempt," but it does not provide them with 10-minute rest breaks, uninterrupted 30-minute meal breaks, or overtime pay, as required by California's wage-and-hour laws (Lab. Code, §§ 226.7, 510, and 512; Cal. Code Regs., tit. 8, § 11040, subds. 3, 11, 12). The complaint therefore alleges statutory wage-and-hour violations, and it seeks meal and rest period premiums, overtime pay, statutory and civil penalties, and an injunction.

## 3.    The Temple's Motion for Summary Judgment

The Temple filed a motion for summary judgment. It asserted that the ECC was a religious school and its preschool teachers were "ministerial employees," as defined by the United

5

States Supreme Court in *Hosanna-Tabor Evangelical v. E.E.O.C.* (2012) 565 U.S. 171 (*Hosanna-Tabor*). The Temple therefore urged that the Commissioner's claims were barred by the "ministerial exception," which precludes government intrusion into certain aspects of the employment relationship between a religious institution and its "ministers."

The Commissioner opposed the Temple's motion for summary judgment. Although the Commissioner did not dispute most of the Temple's facts, she asserted the Temple's preschool program is primarily secular; ECC teachers are not required to study or to adhere to the Temple's theology to be hired or maintain employment; ECC teachers are not ordained or otherwise recognized as spiritual or religious leaders; ECC teachers do not hold themselves out as ministers; the ECC is open to children of parents who are not adherents of the Temple's theology; and the Temple's rabbis, not its teachers, are primarily responsible for the children's religious instruction and spiritual leadership. The Commissioner also asserted the First Amendment does not preclude enforcement of facially neutral labor regulations, and the Temple had not demonstrated that the regulations at issue were substantively at odds with the Temple's religious beliefs or required conduct contrary to those beliefs. Thus, the Commissioner argued, there was no evidence that the wage-and-hour laws at issue burdened the Temple's religious beliefs in a manner that violated the First Amendment.

The court granted the motion for summary judgment. It concluded the Temple's preschool teachers were "ministers" within the meaning of the ministerial exception, explaining that the exception is not limited to the heads of religious congregations, and prior decisions had recognized that preschool

teachers in religious schools could serve ministerial functions. In the present case, it was undisputed "that the ECC fulfills a religious obligation of the Temple; ECC teachers further the Temple's mission and implement Judaic curriculum; ECC teachers teach children about Jewish religious holidays; ECC teachers participate in weekly Shabbat services; ECC teachers teach student[s] to say the Jewish grace blessing before each meal and snack; ECC teachers instruct children in saying the Shema prayer and Oseh Shalom, a prayer for peace; teaching children about religious practices, holidays, and rituals fulfills religious commandments; ECC teachers help transmit Judaism to future generations; Judaism does not preclude a non-Jew from teaching the Jewish religion; early Jewish childhood education impacts not only the child, but the Jewish identity of the child's parents and family; upon a child's completion of the ECC program, the majority of families continue their children's Jewish education at the Temple's schools; and teaching music, singing, and dance to students fulfills a religious obligation and Biblical directive." Under these facts, the court said, "a reasonable trier of fact could not conclude that ECC teachers do not serve a ministerial function."

The court entered judgment on August 16, 2016. The Commissioner timely appealed.

## STANDARD OF REVIEW

A defendant moving for summary judgment must show "that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the

7

moving party is entitled to a judgment as a matter of law." (*Id.*, subd. (c).) We review a trial court's grant of summary judgment de novo, "considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)

## DISCUSSION

### 1. The "Ministerial Exception"

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." (U.S. Const., 1st Amend.)

A "ministerial exception" to Title VII of the Civil Rights Act of 1964 (42 U.S.C., § 2000e et seq.) (Title VII), grounded in the Religion Clauses of the First Amendment, was first articulated by the Fifth Circuit in *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553, and subsequently was recognized by every federal circuit.[1] As articulated by the federal courts, the ministerial

---

[1] See, e.g., *Natal v. Christian and Missionary Alliance* (1st Cir. 1989) 878 F.2d 1575, 1578; *Rweyemamu v. Cote* (2d Cir. 2008) 520 F.3d 198, 204–209; *Petruska v. Gannon University* (3d Cir. 2006) 462 F.3d 294, 303–307; *E.E.O.C. v. Roman Catholic Diocese of Raleigh, NC* (4th Cir. 2000) 213 F.3d 795, 800–801; *Combs v. Cen Tx Ann Conf United Methodist Church* (5th Cir. 1999) 173 F.3d 343, 345–350; *Hollins v. Methodist Healthcare, Inc.* (6th Cir. 2007) 474 F.3d 223, 225–227); *Schleicher v. Salvation Army* (7th Cir. 2008) 518 F.3d 472, 475; *Scharon v. St. Luke's Episcopal Presbyterian Hosp.* (8th Cir. 1991) 929 F.2d 360, 362–363; *Werft v. Desert Southwest Annual Conference* (9th Cir. 2004) 377 F.3d 1099, 1100–1104; *Bryce v. Episcopal Church in Diocese of Colorado* (10th Cir. 2002) 289 F.3d 648, 655–657; *Gellington v. Christian Methodist Episcopal Church*

exception "operates to exempt from the coverage of various employment laws the employment relationships between religious institutions and their 'ministers.' " (*E.E.O.C. v. Roman Catholic Diocese of Raleigh, NC, supra*, 213 F.3d at p. s 800.) As such, it operates as a "constitutionally compelled limitation on civil authority" that ensures "that no branch of secular government trespasses on the most spiritually intimate grounds of a religious community's existence." (*Ibid.*)

The Supreme Court has addressed the ministerial exception just once, in *Hosanna-Tabor, supra*, 565 U.S. at p. 171. At issue in that case was a church school's termination of a teacher, Cheryl Perich, who had been diagnosed with narcolepsy. (*Id.* at p. 178.) Perich was a "called" teacher, who was "regarded as having been called to [her] vocation by God through [her] congregation." (*Id.* at p. 177.) To be eligible to receive a call from the congregation, Perich was required to have completed eight courses of theological study, to have obtained the endorsement of the local Synod district, and to pass an oral examination by a faculty committee. Once called, Perich received the formal title " 'Minister of Religion, Commissioned,' " and could be removed only for cause and by a supermajority of her congregation. (*Id.* at p. 177.)

The school claimed it fired Perich because she threatened to file suit, which violated the Church's belief that Christians should resolve their disputes internally. (*Hosanna-Tabor, supra*, 565 U.S. at p. 180.) Perich filed a charge with the Equal Employment Opportunity Commission (EEOC), which sued the

(11th Cir. 2000) 203 F.3d 1299, 1301–1304; *E.E.O.C. v. Catholic University* of America (D.C. Cir. 1996) 83 F.3d 455, 460–463.

9

church for violating federal and state anti-discrimination laws. (*Id*. at p. 179.) Invoking the "ministerial exception," the church argued the suit was barred by the First Amendment because the EEOC's claims concerned the employment relationship between a religious institution and one of its ministers. (*Id*. at pp. 180–181.) The district court agreed and granted summary judgment for the church; the Sixth Circuit reversed. (*Id*. at pp. 180–181.)

The Supreme Court reversed the Sixth Circuit and reinstated the grant of summary judgment for the church. Significantly, it agreed with the lower federal courts "that there is … a ministerial exception," which is grounded in both the Free Exercise Clause and Establishment Clause of the First Amendment. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 188.) The court explained: "The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." (*Id*. at pp. 188–189.) A ministerial exception avoided these constitutional violations, the court said, by "ensur[ing] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' [citation]—is the church's alone." (*Id*. at pp. 194–195.)

Having recognized the existence of a ministerial exception, the court held that the exception applied in the case before it. Although the court declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," it identified the following facts as relevant to its decision. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 190.)

First, the Church "held Perich out as a minister," with a role distinct from that of most of its members. The court explained: "When [the Church] extended [Perich] a call, it issued her a 'diploma of vocation' according her the title 'Minister of Religion, Commissioned.' She was tasked with performing that office 'according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures.' The congregation prayed that God 'bless [her] ministrations to the glory of His holy name, [and] the building of His church.' In a supplement to the diploma, the congregation undertook to periodically review [the teacher's] 'skills of ministry' and 'ministerial responsibilities,' and to provide for her 'continuing education as a professional person in the ministry of the Gospel.' " (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 191, internal record citations omitted.)

Second, Perich had the title of minister, which reflected significant religious training followed by a formal process of commissioning. Over the course of six years, she had completed eight college-level courses in religious subjects and passed an oral examination by a faculty committee at a Lutheran college. She also had to obtain the endorsement of her local Synod district by submitting a petition that contained her academic transcript, letters of recommendation, personal statement, and written answers to various ministry-related questions. Ultimately, she

11

was commissioned as a minister only upon election by the congregation, which recognized God's call to her to teach. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 191.)

Third, Perich held herself out as a minister by accepting "the formal call to religious service" and claiming a special housing allowance on her taxes available only to employees earning their compensation in the exercise of the ministry. (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 191–192.)

Fourth, Perich's job duties "reflected a role in conveying the Church's message and carrying out its mission." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 192.) Perich taught her students religion three times per week and led her students in prayer three times a day. Once a week, she took her students to a school-wide chapel service, and about twice a year she led the chapel service by choosing the liturgy, selecting the hymns, and delivering a short message based on Bible verses. Thus, she "performed an important role in transmitting the Lutheran faith to the next generation." (*Ibid*.)

The court concluded: "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—we conclude that Perich was a minister covered by the ministerial exception." (*Hosanna-Tabor*, 565 U.S. at p. 192.) The court expressed no view whether someone with Perich's duties—including lay teachers who performed the same tasks but were not "called" or identified as ministers—"would be covered by the ministerial exception in the absence of the other considerations." (*Id*. at p. 193.)

## 2.     The ECC's Teachers are not "Ministers"

The Temple contends that as a matter of law, the ECC's teachers are "ministers" as defined by *Hosanna-Tabor*. We disagree.

First, nothing in the record suggests the Temple held out its ECC teachers as ministers. Unlike Perich, the teacher in *Hosanna-Tabor*, ECC teachers are not given religious titles, and they are not ordained or otherwise recognized as spiritual leaders. To the contrary, it is undisputed that teachers are not required to adhere to the Temple's religious philosophy, to be Temple members, or, indeed, even to be Jewish. As a result, while some ECC teachers are practicing Jews, others are non-Jewish or do not identify with any faith tradition.

Second, in contrast to Perich, who was required to take eight college-level courses on a variety of faith-based subjects and pass an oral examination administered by a faculty committee at a Lutheran college, the Temple does not require its teachers to have any formal Jewish education or training. Thus, some ECC teachers are hired without any knowledge of Jewish religion or practice. Further, although teachers are provided with Judaic reading materials and a "holiday packet" to use for classroom activities, no course work in Judaism is required once teachers are hired.

Third, again in contrast to Perich, there is no evidence that any of the ECC's teachers held themselves out as ministers. Instead, they describe themselves as "teachers" and have not claimed any tax benefits available only to ministers.

Only with respect to the fourth consideration in *Hosanna-Tabor* do ECC teachers and Perich have anything in common: They both taught religion in the classroom. As we have described,

ECC teachers are responsible for implementing the school's Judaic curriculum by teaching Jewish rituals, values, and holidays, leading children in prayers, celebrating Jewish holidays, and participating in weekly Shabbat services. As such, they have a role in transmitting Jewish religion and practice to the next generation.

Considering all the relevant circumstances of the teachers' employment, we conclude the ministerial exception does not foreclose the Commissioner's claims. Although the ECC's teachers are responsible for some religious instruction, we do not read *Hosanna-Tabor* to suggest that the ministerial exception applies based on this factor alone. To the contrary, it was central to *Hosanna-Tabor*'s analysis that a minister is not merely a teacher of religious doctrine—significantly, he or she "personif[ies]" a church's (or synagogue's) beliefs and "minister[s] to the faithful." (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 188–189, 196.) The record in the present case is clear that the Temple's teachers did not play such a role in synagogue life. Indeed, as we have said, many of the Temple's teachers are not members of the Temple's religious community or adherents to its faith. Thus, while the teachers may play an important role in the life of the Temple, they are not its ministers.

Our conclusion is consistent with the Ninth Circuit's recent decision in *Biel v. St. James School* (9th Cir. 2018) 911 F.3d 603 (*Biel*). Like the ECC teachers in the present case, the plaintiff in *Biel* was a teacher in a religious school. After the school terminated her employment, Biel sued, claiming the termination violated the Americans With Disabilities Act. The Ninth Circuit reversed the district court's determination that Biel's suit was barred by the ministerial exception. (*Id.* at p. 605.) The court

noted that Biel was not religiously educated or trained; she was held out by the church as a "teacher," not a "minister;" she was employed at-will; and she did not claim benefits available only to ministers. (*Id*. at pp. 608–609.) Although Biel taught lessons on Catholic faith four days a week and incorporated religious themes into her classroom environment and curriculum, the court concluded based on "the totality of Biel's role" that the ministerial exception did not foreclose her claim. (*Id*. at p. 605.)

Similarly, in *Herx v. Diocese of Ft. Wayne-South Bend Inc.* (N.D. Ind. 2014) 48 F.Supp.3d 1168, 1176–1177 (*Herx*), the court held that employment discrimination claims brought by a teacher against a Catholic school were not barred by the ministerial exception. The court explained: "[Plaintiff] has never led planning for a Mass, hasn't been ordained by the Catholic Church, hasn't held a title with the Catholic Church, has never had (and wasn't required to have) any religious instruction or training to be a teacher at the school, has never held herself out as a priest or minister, and was considered by the principal to be a 'lay teacher.' … Labeling [plaintiff] a 'minister' based on her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception and ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the *Hosanna-Tabor* Court." (*Id*. at p. 1177; see also in *Bohnert v. Roman Catholic Archbishop of San Fran.* (N.D. Cal. 2015) 136 F.Supp.3d 1094, 1113–1115, [sexual harassment claim brought by a teacher at Catholic high school was not barred by the ministerial exception because she was not an ordained minister, was not "called," and lacked a theological education]; but see *Grussgott v. Milwaukee Jewish*

15

*Day School* (7th Cir. 2018) 882 F.3d 655, 656–662 [applying ministerial exception to Jewish grade school teacher]; *Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011) 201 Cal.App.4th 1041 [applying ministerial exception to Protestant preschool teacher; decided prior to *Hosanna-Tabor*].)

The present case is analogous to *Biel* and *Herx*. Like the teachers in those cases, the Temple's preschool teachers teach religion, but they need not be religiously educated and they are not held out as ministers. Indeed, as we have said, many of the Temple's teachers are not practicing Jews. We conclude, like the *Biel* and *Herx* courts, that the ministerial exception does not apply.

In so concluding, we do not, as the Temple suggests, treat *Hosanna-Tabor*'s analysis as a " 'rigid formula for deciding when an employee qualifies as a minister.' " That is, we do not conclude that the ECC's teachers are not ministers simply because they do not satisfy all four of the *Hosanna-Tabor* factors or because the teachers' role in their religious community is different than Perich's role in hers. *Hosanna-Tabor* compels us to distinguish between those church or synagogue employees who are sufficiently central to a religious institution's mission that they are exempt from the protection of the state's generally applicable employment laws, and those who are not. And although ECC teachers undeniably play an important role in Temple life, the undisputed evidence does not establish that they "minister to the faithful" or "personify its beliefs" in the manner contemplated by *Hosanna-Tabor*. (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 188–189.) As such, the claims advanced on their behalf by the Commissioner are not, as a matter of law, barred by the ministerial exception.

16

## DISPOSITION

The judgment is reversed.[2] The trial court is directed to issue a new order denying the Temple's motion for summary judgment and to conduct further proceedings consistent with this opinion. The Temple's motion to strike portions of the Commissioner's reply brief is denied. The Commissioner is awarded her costs on appeal.

**CERTIFIED FOR PUBLICATION**

LAVIN, J.

I concur:

EGERTON, J.

---

[2] Given our holding, it is unnecessary to decide whether the ministerial exception applies to California's wage-and-hour laws.

17

EDMON, P.J., concurring in the judgment.

I agree with the majority that the grant of summary judgment must be reversed because the Temple has not demonstrated that its employment relationship with its preschool teachers is exempt from the state's wage-and-hour laws. However, I write separately to address a threshold question not considered by the majority opinion: Whether the ministerial exception, as described in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (2012) 565 U.S. 171 (*Hosanna-Tabor*) and grounded in the First Amendment, applies at all in the present case. For the reasons that follow, I would conclude that the Temple has not demonstrated that the ministerial exception has any application to the present dispute, which does not touch on the Temple's freedom to choose its ministers or to practice its beliefs. I therefore would hold that the ministerial exception does not bar the present suit without regard to whether the Temple's preschool teachers are "ministers."

1. **Under Supreme Court Jurisprudence, Religious Institutions Generally Are Not Exempt from Neutral Laws of General Application**

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." (U.S. Const., 1st Amend.)

The Supreme Court's First Amendment jurisprudence consistently has held that religious institutions and their members are not exempt from most neutral laws of general application. (*Trinity Lutheran Church of Columbia, Inc. v. Comer* (2017) 137 S.Ct. 2012, 2020; *Hosanna-Tabor*, *supra*, 565 U.S. at pp. 189–190.) For example, in *Employment Div., Dept. of Human Resources of Ore. v. Smith* (1990) 494 U.S. 872 (*Employment Div.*

*v. Smith*), the Supreme Court upheld the denial of state unemployment benefits to two members of a Native American Church who had been fired from their jobs for using peyote, which was a crime under Oregon law.  The employees challenged the denial of benefits, contending they had ingested peyote for sacramental purposes at a Native American church ceremony, and therefore the state's action violated their right to free exercise of religion.  (*Id*. at pp. 874–875.)  The court held that while the Free Exercise Clause protects religious beliefs, "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."  (*Id*. at pp. 878–879.)  To the contrary, the court said, its decisions "consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' "  (*Id*. at p. 879.)

The high court similarly concluded in *Tony and Susan Alamo Foundation v. Secretary of Labor* (1985) 471 U.S. 290, in which it considered whether applying the minimum wage, overtime, and recordkeeping requirements of the Fair Labor Standards Act (FLSA) to workers engaged in a religious foundation's commercial activities violated the foundation's rights under the First Amendment.  The court concluded that applying the FLSA did not violate the foundation's Free Exercise rights because "[i]t is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights"—a

2

showing the foundation had not made. (*Id*. at p. 303.) The court also concluded that the FLSA did not violate the foundation's Establishment Clause rights because the FLSA neither had a " 'primary effect' of inhibiting religious activity" nor fostered " ' "an excessive government entanglement with religion." ' " (*Id*. at p. 305.) Thus, the court said, notwithstanding the foundation's religious character, "application of the Act to the Foundation's commercial activities is fully consistent with the requirements of the First Amendment." (*Id*. at p. 306.)

## 2. The "Ministerial Exception"

The Supreme Court recognized a limited exception to the principle that most neutral, generally-applicable laws may be applied constitutionally to religious institutions in *Hosanna-Tabor*, *supra*, 565 U.S. 171. There, Cheryl Perich, an elementary school teacher whose employment was terminated after she was diagnosed with narcolepsy, sued her church employer for disability discrimination, seeking reinstatement and damages. The church claimed it fired Perich because she threatened legal action against the church, which it claimed was inconsistent with its religious beliefs. (*Id*. at pp. 178–179.) The court resolved the case in favor of the church, holding that the ministerial exception precluded application of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. to Perich's claims. (*Id*. at p. 188.)

Three aspects of the court's analysis are notable for present purposes. First, the court characterized the ministerial exception as compelled by the First Amendment's Religion Clauses. The court explained that imposing an unwanted minister on a church infringes both "the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, "which

3

prohibits government involvement in such ecclesiastical decisions." (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 188–189.) A ministerial exception avoided these constitutional violations, the court said, by "ensur[ing] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' [citation]—is the church's alone." (*Id*. at pp. 194–195.)

Second, the court described the ministerial exception as protecting the freedom of religious organizations to "accept or retain" their own ministers. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 188.) The court explained: "Requiring a church to *accept or retain an unwanted minister*, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." (*Ibid.*, italics added.) And, the court said, the ministerial exception was necessary to protect a religious group's right to shape its faith and mission "*through its appointments*." (*Ibid*., italics added.) Concluding otherwise, it explained, would be to accept the "remarkable view" that the Religion Clauses "have nothing to say about a religious organization's freedom to *select its own ministers*." (*Id*. at p. 189, italics added.)

Third, in concluding that the ministerial exception barred Perich's suit against the school, the court "express[ed] no view" on the doctrine's application to other claimants and other claims. It explained: "The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars *other* types of suits, including actions

4

by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 196, italics added.)

In short, *Hosanna-Tabor* applied the ministerial exception in a limited context: in a case implicating a church's retention of a minister. It expressly did not decide whether, and how, the ministerial exception might apply to cases presenting other issues.

3.    **The Temple Has Not Demonstrated That the Ministerial Exception Applies in the Present Case**

The present appeal raises one of the many questions left unanswered by *Hosanna-Tabor*—namely, whether the ministerial exception applies to wage-and-hour claims such as those alleged by the Commissioner in this case. On the record before us, I would conclude that it does not.

The Temple relies on a number of pre-*Hosanna-Tabor* cases that have interpreted the ministerial exception broadly and have suggested that it exempts from court scrutiny *all* " 'employment decisions regarding . . . ministers,' " without regard to whether those decisions "actually burden" the free exercise of religion or result in excessive government entanglement with religion. (*Alcazar v. Corp. of Catholic Archbishop of Seattle* (9th Cir. 2010) 598 F.3d 668, 673–674 (*Alcazar*), aff'd in part & vacated in part (9th Cir. 2010) 627 F.3d 1288 [ministerial exception barred application of Washington's Minimum Wage Act to Catholic seminarians suing for overtime wages]; see also *Skrzypczak v. Roman Catholic Diocese of Tulsa* (10th Cir. 2010) 611 F.3d 1238

5

[ministerial exception barred religious director's post-termination claims against church for violations of various antidiscrimination laws, including the Equal Pay Act]; *Shaliehsabou v. Hebrew Home of Washington* (4th Cir. 2004) 363 F.3d 299 [ministerial exception barred kosher supervisor's overtime claim under FLSA]; *Schleicher v. Salvation Army* (7th Cir. 2008) 518 F.3d 472 [ministerial exception barred minimum wage and overtime claims brought by Salvation Army ministers under FLSA].)  In the view of those cases, an "actual burden" inquiry is not necessary because "government interference with the church-minister relationship *inherently* burdens religion."  (*Alcazar*, at p. 673.)  The Temple urges this broad view of the ministerial exception, suggesting that requiring a religious employer to demonstrate burden or excessive entanglement "miss[es] the point."

In my view, *Hosanna-Tabor* neither requires nor permits such an expansive reading of the ministerial exception.  As noted above, *Hosanna-Tabor* arose in a particular factual context—a church's termination of a minister—that most plainly calls for the application of the ministerial exception.  The opinion took pains to emphasize that it "express[es] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers."  (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 196.)  Nothing in the opinion, therefore, requires the ministerial exception's application to wage-and-hour claims brought by or on behalf of ministers; to the contrary, the opinion expressly leaves for future determination "the applicability of the exception to other circumstances if and when they arise."  (*Ibid*.)

6

Moreover, the constitutional imperative against encroaching on a church's selection of its ministers does not, as a logical matter, suggest that churches must be exempted from *all* laws that would regulate the employment relationship between a religious institution and its ministers. Given the number and variety of federal and state employment laws, it stands to reason that some laws will impose a greater burden on religious interests than will others. Accordingly, courts can, without doctrinal inconsistency, exempt churches from the application of *some* employment laws without exempting churches from *all* such laws.

Finally, because the ministerial exception is a First Amendment doctrine, I believe its scope necessarily is limited to what is necessary to comply with the Free Exercise and Establishment Clauses. I therefore agree with other courts that have suggested it strays too far from the rationale of the First Amendment to extend constitutional protection to all employment-related actions by churches that affect ministers. (See, e.g., *Bigelow v. Sassafras Grove Baptist Church* (N.C.App. 2016) 247 N.C.App. 401, 411–412 [ministerial exception did not bar minister's claim against church for violating the North Carolina Wage and Hour Act: "Here, plaintiff's claims, rather than asking the court to address ecclesiastical doctrine or church law, require the court only to make a secular decision regarding the terms of the parties' contract and to apply the neutral principles of the Wage and Hour Act"]; *Sumner v. Simpson University* (2018) 27 Cal.App.5th 577, 580-581 [breach of contract claim brought by terminated dean against theological seminary held not barred by ministerial exception: "Defendants have failed to show that resolution of Sumner's contract claim would

7

excessively entangle the court in religious matters"]; *Jenkins v. Refuge Temple Church of God in Christ, Inc.* (2018) 424 S.C. 320, 329–330 [pastor's widow's breach of contract claim was not barred by ministerial exception because "the parties in this case are not asking this court to resolve an employment discrimination suit or a dispute over who will lead a church"]; *Kirby v. Lexington Theological Seminary* (Ky. 2014) 426 S.W.3d 597, 615 [ministerial exception did not bar tenured professor's claims against theological seminary for breach of contract; by allowing claims to proceed, the government was not interfering in seminary's "selection of its ministers"]; *Second Episcopal Afr. Methodist Church v. Prioleau* (D.C. App. 2012) 49 A.3d 812, 817 [ministerial exception did not bar minister's breach of contract action against church because it would not "require the court to entangle itself in church doctrine"]; *Bollard v. California Province of Soc. of Jesus* (9th Cir. 1999) 196 F.3d 940 (*Bollard*) [ministerial exception did not bar novice priest's sexual harassment claim against Jesuit order].)

For all of these reasons, I would reject the expansive application of the ministerial exception suggested by the Temple, and instead adopt the narrower construction articulated by the Ninth Circuit in *Bollard*, *supra*, 196 F.3d 940. *Bollard* holds that the ministerial exception insulates a religious organization's decisions regarding its ministers from judicial scrutiny when the disputed practices involve the institution's *freedom to choose its ministers or to practice its beliefs*. This limited exception is required by the Free Exercise and Establishment Clauses of the First Amendment, providing "important protections to churches that seek to choose their representatives free from government interference and according to the dictates of faith and

8

conscience." (*Id*. at p. 945.) However, where a religious institution "is neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a constitutionally protected religious practice," the ministerial exception does not apply. (*Id*. at p. 944.)

Bollard's analysis recognizes that simply because the person on whose behalf a suit is brought is a minister does not necessarily mean that the aspect of the church-minister employment relationship that warrants heightened constitutional protection—a church's freedom to choose its representatives and practice its beliefs—is present. The constitutional rationale for protecting some of a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant. (*Bollard*, *supra*, 196 F.3d at p. 947.) That rationale does not apply in the present case, where what is at issue is not *who* the Temple will select to educate its youngest students, but only whether it will provide the people it has chosen with meal breaks, rest breaks, and overtime pay.

For all of these reasons, I would conclude that the Temple has not demonstrated that the ministerial exception bars the Commissioner's claims. This is not a case about the Temple's choice of representative, a decision to which we would simply defer without further inquiry. And, significantly, the Temple has never offered a religious justification for its alleged failure to abide by California's wage-and-hour laws. Thus, there is no danger that "by allowing this suit to proceed, we will thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine." (*Bollard*, *supra*, 196 F.3d at p. 947.) On the record before us, I

9

therefore would conclude that the ministerial exception has no application to the Commissioner's wage and hour claims, and I would reverse the grant of summary judgment on this basis.

To be clear, I do not believe that the views I have just articulated mean a religious institution can *never* demonstrate that its employment relationship with a ministerial employee is exempt from the wage-and-hour laws—to the contrary, I believe that in appropriate cases, the First Amendment may well compel an exemption from those laws to avoid " 'trench[ing] on [a] Church's protected ministerial decisions.' " (*Alcazar*, *supra*, 598 F.3d at p. 674.) What it does mean is that employers cannot avoid claims of wage-and-hour violations merely by establishing that they are religious institutions and their employees are "ministers." Instead, to avoid claims of wage-and-hour violations like those alleged in this case, a religious employer must demonstrate that applying the wage-and-hour laws to its ministers violates either the Free Exercise Clause or the Establishment Clause. (See, e.g., *Bollard*, *supra*, 196 F.3d at pp. 945–950.) The Temple has made no such showing in this case.


EDMON, P. J.

10