SECOND EPISCOPAL DISTRICT AF-
RICAN METHODIST EPISCOPAL
CHURCH, et al., Appellants,

v.

Reverend Deloris PRIOLEAU, Appellee.

No. 11–CV–382.

District of Columbia Court of Appeals.

Argued May 15, 2012.
Decided Aug. 9, 2012.

Winfred R. Mundle, Sr., with whom Samuel C. Hamilton, Silver Spring, MD, was on the brief, for appellants.

Bernard C. Coleman, Jr., for appellee.

Before WASHINGTON, Chief Judge, and FISHER and EASTERLY, Associate Judges.

WASHINGTON, Chief Judge:

Second Episcopal District African Methodist Episcopal Church and Cornerstone African Methodist Episcopal Church appeal from a trial court order denying their motion to dismiss for lack of subject matter jurisdiction. As before the trial court, appellants claim immunity from suit under the religion clauses of the First Amendment. We affirm.

## I.

On September 10, 2009, Reverend Deloris Prioleau filed a complaint in Superior Court asserting a single claim for breach of contract against Second Episcopal District African Methodist Episcopal Church and Cornerstone African Methodist Episcopal Church (collectively, "the church" or "appellants"). According to her complaint, Reverend Prioleau entered into a series of year-long contracts with the church. The church paid her as promised under each of the contracts, with one exception. The

church failed to pay her $39,000 it owed her under the contract covering her final year as pastor.

On December 8, 2009, appellants filed a motion to dismiss for lack of subject matter jurisdiction, claiming immunity from suit. On January 19, 2010, the trial court denied the motion by written order. On July 12, 2010, appellants filed another motion to dismiss, again claiming immunity but characterizing the motion to dismiss as a "factual" attack on jurisdiction. Along with the motion to dismiss, appellants submitted letters from two members of the church. The trial court held an evidentiary hearing on March 3, 2011, wherein Reverend Prioleau presented testimony of three witnesses. Appellants did not present testimony at the hearing.

The evidence showed that Reverend Prioleau is a Class A pastor within the hierarchy of the African Methodist Episcopal ("AME") Church. In April 2004, Reverend Prioleau was given a charge to serve as pastor of the Cornerstone AME Church for one year, and the charge was renewed in April 2005, April 2006, and April 2007. When Reverend Prioleau became pastor in April 2004, the church had low enrollment, it had defaulted on its second mortgage, and it had been in default for two years. The church also needed renovations—it did not even have a front door. After almost two years of efforts, Reverend Prioleau managed to refinance the mortgage and obtained $79,000 from the refinancing. The Church Conference (i.e., the enrolled congregation) decided to use the funds to renovate the church. When major problems with the electrical and plumbing systems threatened to derail the renovations, the Church Conference decided to take out an additional loan.[1]

The church paid Reverend Prioleau in accordance with the parties' yearly contracts during her first three years as pastor. However, because of the church's financial difficulties, in her fourth year, Reverend Prioleau agreed to receive her salary and housing allowance on a payment plan rather than in the amounts and on the schedule previously agreed upon. She received payments in accordance with the payment plan until April 2008. At the Annual Conference that year, Reverend Prioleau was given a charge to serve as pastor at a different church. She refused the charge, and from that point on, she did not receive any further payments from the church. Reverend Prioleau testified that the church owes her $39,200 under terms of the contract covering her final year of service at Cornerstone AME.

Cornerstone AME's Steward and Finance Board ("Board") met in April 2008. The Board's budget director, Mary Warren,[2] presented to the Board a statement of accounts which listed the individuals to whom money was owed, how much was owed, and whether payments were in arrears. According to the statement, the church owed Reverend Prioleau $39,200 and had a total debt of $63,570. Six of the nine Board members attended the meeting at which the statement of accounts was presented, and they all signed the document. In doing so, they declared, "We the officers of the Cornerstone AME Church agree that all of these debts are accurate as of 4/6/2008." When discussing the church's debt to Reverend Prioleau, the Board did not discuss whether she had performed her obligations in accordance with religious doctrine. Ms. Warren later presented the statement of accounts to the

---

1. The church took out a loan from Earl Prioleau, Reverend Prioleau's husband.

2. Mary Warren is Reverend Prioleau's daughter.

Presiding Elder, as she had done in previous years.

After hearing all the evidence, the trial court concluded that Reverend Prioleau had "established by a preponderance of the evidence that this is a straightforward contract case, uncomplicated by ecclesiastical considerations." This appeal followed.

## II.

■ The issue of subject matter jurisdiction is a question of law that this court reviews *de novo*. *Pardue v. Center City Consortium Sch. of the Archdiocese of Washington, Inc.*, 875 A.2d 669, 675 (D.C. 2005); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C.2005); *Heard v. Johnson*, 810 A.2d 871, 877 (D.C. 2002); *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington v. Beards (Bible Way Church)*, 680 A.2d 419, 427 (D.C.1996).

■ Not all attacks on subject matter jurisdiction are analyzed under the same standard. In a "facial" attack, the court determines jurisdiction by looking only at the face of the complaint and taking as true the allegations in the complaint. *Heard*, 810 A.2d at 877. By contrast, in a "factual" attack, the court considers matters outside the face of the complaint and does not presume that the allegations in the complaint are true. *Id.* at 878. Moreover, a "factual" attack "may occur at any stage of the proceedings and [the] plaintiff bears the burden of proof that jurisdiction does in fact exist." *Id.* (quotation marks and citation omitted). Here, appellants' July 12, 2010, motion to dismiss was a "factual" attack: appellants characterized the motion as a "factual" attack and filed as attachments to the motion letters from two members of Cornerstone AME.[3]

## III.

■ The Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution "severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations." *Meshel*, 869 A.2d at 353 (citing *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)); *see also United Methodist Church, Baltimore Annual Conference v. White*, 571 A.2d 790, 794 (D.C.1990) ("[G]enerally, civil courts are not a constitutionally permissible forum for review of ecclesiastical disputes."). "The Free Exercise Clause requires civil courts to defer to the decisions of the highest tribunals of hierarchical religious organizations on matters of religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law ... and to give equal deference to decisions on ecclesiastical matters reached by congregational reli-

---

3. Appellants nonetheless suggest that the trial court erred in holding an evidentiary hearing. We disagree. In deciding a Super. Ct. Civ. R. 12(b)(1) motion, the court may review "any evidence submitted by the parties, including affidavits, without converting the motion into a Rule 56 motion for summary judgment." *See Lipscombe v. Crudup*, 888 A.2d 1171, 1173 n. 2 (D.C.2005) (citation omitted). Here, where Reverend Prioleau had the burden of proving that jurisdiction did in fact exist, and no presumption of truthfulness attached to the allegations in her complaint, *see, e.g., Heard*, 810 A.2d at 877–78, the trial court did not err in holding an evidentiary hearing.

Appellants also invite us to revisit the trial court's January 19, 2010, order denying their "facial" attack on jurisdiction. However, appellants' March 22, 2011, notice of appeal is untimely as it pertains to that order. *See* D.C.App. R. 4(a)(1) ("The notice of appeal in a civil case must be filed ... *within 30 days after entry of the judgment or order from which the appeal is taken* ....") (emphasis added).

gious organizations." *Meshel,* 869 A.2d at 353–54 (citations omitted).

■ However, civil court review of church action is not entirely prohibited. *Bible Way Church,* 680 A.2d at 427. We have noted that "churches may be held liable under valid contracts," and we have identified several areas in which civil courts have jurisdiction over church action. *See Heard,* 810 A.2d at 880 (citing cases). The touchstone for determining whether civil courts have jurisdiction is whether the courts may employ "neutral principles of law" and ensure that their decisions are not premised on the "consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Meshel,* 869 A.2d at 354 (quoting *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). "[I]n determining whether the adjudication of an action would require a civil court to stray impermissibly into ecclesiastical matters, we look not at the label placed on the action but at the actual issues the court has been asked to decide." *Id.* at 356.

We have consistently adhered to the "neutral principles of law" approach when addressing religious organizations' immunity claims. In *Bible Way Church,* for instance, church members asserted a negligence claim against the church over its alleged failure to account for church funds and issue financial reports to church members. 680 A.2d at 423. The trial court denied the church's facial attack on jurisdiction, reasoning that the church's negligence, if any, could be determined by reference to objective, well-established standards of accounting and reporting that would not entangle the court in ecclesiastical matters. *Id.* at 425. We reversed because even though the church members had referenced a particular set of accounting and reporting standards in defining the applicable standard of care,

they had not alleged that: (1) those accounting and reporting standards were universally applicable; or that (2) the church had in fact adopted them. *Id.* at 428. Therefore, in order to resolve the parties' dispute, the court would have had to determine whether the church *should* apply those standards. *Id.* at 429. That determination would have required the court to entangle itself in ecclesiastical matters because accounting is an area "riddled with major subjective decisions" that "raise questions of internal church governance which are often themselves based on the application of church doctrine." *Id.*

We reached the opposite conclusion in *Meshel.* There, an Orthodox Jewish congregation's bylaws provided that any claim by a member against the congregation that cannot be amicably resolved shall be referred to a Beth Din, a panel of Orthodox rabbis that sits without a jury and renders decisions in private disputes through the application of Jewish law. *Id.* at 354. When a dispute over the governing structure of the congregation arose, members brought an action to compel the congregation to submit to binding arbitration before a Beth Din. *See id.* at 347–53. The trial court held that it could not resolve the action without delving into the religious practices of the congregation, determining the proper definition of a Beth Din, and otherwise interpreting Orthodox Jewish law. *Id.* at 353. We reversed, holding that a civil court could resolve the action according to objective, well-established principles of law. *Id.* We reasoned that the trial court would have to make two findings that accompany every action to compel arbitration and that are governed by traditional principles of contract law: whether the parties had an enforceable agreement to arbitrate; and, if so, whether the underlying dispute between the parties

fell within the scope of the agreement. *Id.* at 354.

 In addition to the principles described above, the Free Exercise Clause precludes civil courts from interfering with a religious organization's right to choose its ministers. *White,* 571 A.2d at 794. Under the "ministerial exception" first articulated in *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.1972), a church's decision to hire, to fire, and to prescribe the duties of its minister are commonly held to be constitutionally protected. We have held that the "ministerial exception" may be raised as a bar to suits alleging discrimination under the District of Columbia Human Rights Act, *see Pardue,* 875 A.2d at 673, but we have not gone so far as to hold that the "ministerial exception" bars all claims by ministerial employees.

 In this case, we are satisfied that the First Amendment does not bar Reverend Prioleau from pursuing her contract claim against the church. The record as developed does not suggest that resolving Reverend Prioleau's contract claim will require the court to entangle itself in church doctrine. Rather, the record shows that Reverend Prioleau entered into a year-long contract to serve as pastor of the church, that she completed her obligations under the contract, and that the church did not honor its promise to pay her. Consequently, the trial court should be able to resolve the claim by employing neutral principles of law.

Reverend Prioleau does not challenge the church's authority to hire, to fire, or to assign her duties, and she does not seek reinstatement. In other words, she does not seek to "limit the church's choice of its religious representatives," *White,* 571 A.2d at 794, and we decline to extend the "ministerial exception" to categorically bar any claim whatsoever by a ministerial employee.

We find support for these conclusions in *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354 (D.C.Cir.1990), which involved a contract claim similar to that presented here. There, a minister alleged that the district superintendent of his church failed to fulfill his promise to provide him with a congregation more suited to his training and skills in exchange for his continued work at another church on a temporary, emergency basis. *Id.* at 1359. The court held that the minister's contract claim could not be foreclosed on a motion to dismiss. *Id.* at 1361. In doing so, the court observed that, "[a]s a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry into whether appellant's superintendent promised him a more suitable congregation, whether appellant gave consideration in exchange for that promise, and whether such congregations became available but were not offered to [him]." *Id.* at 1360. The court also observed that because the minister sought only money damages, there was "no potential for distortion of church appointment decisions." *Id.*

Appellants argue that *Minker* is inapposite, and that our decisions in *White* and *Bible Way Church* control here. We disagree. In addition to contract claims, *White* involved wrongful termination claims based on allegedly mistaken judgments by church officials and misapplication or violation of church doctrine. 571 A.2d at 793. Because those claims raised "issues at the core of internal church discipline, faith and church organization," and because the minister failed to differentiate his contract claims from his wrongful termination claims, we concluded that resolving the minister's contract claims "would involve more than simply the secular questions of whether such promises were made by [the church] and, if so, whether the

benefits were properly denied." *Id.* at 795–96. In this case, Reverend Prioleau's contract claim stands alone. In contrast with the plaintiff in *White,* she does not claim she was wrongfully terminated or otherwise tether her contract claim to matters of church doctrine or governance; she claims only that the church failed to pay her salary after acknowledging its obligation to do so. Likewise, in contrast with the plaintiffs in *Bible Way Church,* 680 A.2d at 429, Reverend Prioleau has demonstrated that the trial court can resolve her claim without delving into matters reserved for ecclesiastical judgment.

We hold that the First Amendment does not bar the civil courts from resolving Reverend Prioleau's contract claim. We note, however, as did the court in *Minker,* that going forward, if it becomes apparent to the trial court that this dispute does in fact turn on matters of doctrinal interpretation or church governance, the trial court may grant summary judgment to avoid "excessive entanglement with religion." 894 F.2d at 1360.

## IV.

In light of the foregoing, we affirm the judgment of the trial court and remand for proceedings consistent with this opinion.

*So ordered.*