Filed 11/21/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANNETTE LORENZO,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO ZEN CENTER et al.,<br><br>        Defendants and Respondents. | A171659<br><br>(City & County of San Francisco Super. Ct. No. CGC-22-602047) |

In *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC* (2012) 565 U.S. 171, 188 (*Hosanna-Tabor*), the United States Supreme Court recognized, for the first time, a ministerial exception under the Religion Clauses of the First Amendment.  Under that exception, courts must "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions" (*Our Lady of Guadalupe Sch. v. Morrissey-Berru* (2020) 591 U.S. 732, 746 (*Our Lady*)), if those disputes will, by their very nature, require "the court to resolve a religious controversy" (*Sumner v. Simpson University* (2018) 27 Cal.App.5th 577, 590 (*Sumner*)).  Applying the exception, the high court has barred "a minister's employment discrimination suit based on the church's decision to fire her." (*Id.* at p. 580.)  We now consider whether the ministerial exception bars claims under California's minimum wage and overtime laws even though there is no evidence that those claims would interfere "with an internal church decision that affects the faith and mission of the church

1

itself." (*Hosanna-Tabor*, at p. 190.)  We conclude it does not.

In this case, plaintiff Annette Lorenzo appeals a judgment in favor of defendants and respondents San Francisco Zen Center (Center), Linda Galijan, and Mike Smith (collectively, defendants) following the trial court's order granting summary judgment against Lorenzo.  The court held that the ministerial exception barred Lorenzo's wage-and-hour claims even though defendants presented no evidence that her claims raised an ecclesiastical concern.  But without such evidence, the Religion Clauses cannot and do not bar Lorenzo's wage claims.  We therefore reverse.

We also find that the trial court erred in denying Lorenzo's motion to dismiss the appeals of Galijan and Smith because they did not post an undertaking as required by Labor Code section 98.2, subdivision (b).[1]  The Labor Commissioner found Galijan and Smith liable under section 558.1— which renders them "liable *as the employer* for" the wage-and-hour violations alleged by Lorenzo.  (Italics added.)  Because section 98.2, subdivision (b), requires "an employer" to post an undertaking in order to perfect that employer's appeal from a Labor Commissioner's order, both Galijan and Smith could only appeal the order against them if they each posted an undertaking.  But the undertaking posted by the Center did *not*, by its terms, include Galijan and Smith.  The court therefore lacked jurisdiction to hear Galijan's and Smith's appeals.  For this independent reason, we reverse the judgment in favor of Galijan and Smith.

---

[1] All further statutory references are to the Labor Code unless otherwise specified.

# I.  BACKGROUND

A.  Facts

### 1.  The Center

The Center is a nonprofit religious corporation founded in 1962 and is one of the largest Sōtō Zen Buddhist churches in North America.  Its "specific and primary purpose" is to "encourage the practice of Zen Buddhism by operating one or more religious practice facilities and educating the public about Zen Buddhism."  The Center has three training temples—City Center, Tassajara Mountain Center (Tassajara), and Green Gulch Farm.  It offers residential training programs at all three temples.  Participants in those programs live at one of the temples full time as a monk.  Smith was the former director of the Center and "supervised the senior staff that supervised the work crews."  Galijan was the former president of the Center and "supervised the directors of the three temples."

The Center generates income by renting out rooms at all three temples to overnight guests who are not members as well as conference and event space at Green Gulch Farm to corporations like Facebook and Google.  Tassajara is open to the public and guests staying there go to the "hot springs, [or] baths" and "do not have to practice Buddhism."  Between 2015 and 2019, the Center's "primary source of income came from guest season at Tassajara."

An individual may join the Center's residential training program through its guest student program.  After at least a two-week stay, a guest student may apply to the Work Practice Apprentice (WPA) program, an entry-level, full-time Zen training program "that lasts 2 years and must be completed within 3 years."  "WPAs follow a strict practice schedule of formal and work practice."  Formal practice includes morning and evening zazen

3

(meditation), service (sutra chanting and bowing), temple cleaning, as well as dharma talks and special ceremonies. Work practice "is an integral and indivisible part of the Zen training and spiritual practice" and consists of communal tasks like dishwashing, bathroom cleaning, cooking, as well as ceremonial tasks that support formal practice like ringing bells and cleaning altars. "WPAs are expected to take part [in] 30–35 hours of work practice, as well as talks, discussions, and classes on work practice, and 20 hours per week of meditation and curriculum."

After completing training as a WPA, an individual may apply for a staff position at the Center, "which is a continuation of Zen training." Staff members are required "to live at the practice center where they work in order to accomplish both their practice obligations and their specific work practice obligations." The Center provides WPAs and low-level staff with modest monthly stipends as well as room and board. Additionally, "WPAs serve the guests visiting Tassajara."

### 2. Lorenzo's Time at the Center

In 2015, after participating in the Center's guest student program, Lorenzo became a WPA at the City Center location. During her time there, she "was responsible for cleaning guest rooms, doing laundry, giving tours of the facility, and checking guests into their rooms." In January 2016, Lorenzo continued as a WPA at Tassajara where she worked in both the kitchen and bathhouse. As a member of the kitchen crew, Lorenzo "prepared and chopped vegetables, cleaned the kitchen, and washed pots and pans." As a bathhouse attendant, she "prepared the baths for guests, including cleaning toilets [and] showers, sweeping the patio walkways, [and] checking the temperature of the baths, and organize[d] supplies."

4

In January 2017, Lorenzo became a staff member at Tassajara. During the first part of 2017, she served as the assistant to the executive chef. Her responsibilities included taking inventory as well as ordering and organizing supplies. She also prepared and bagged lunches for guests during the summer guest season. In January 2018, Lorenzo was a staff member at City Center and worked as a librarian. In March 2019, Lorenzo was asked to leave and ended her affiliation with the Center. Her final monthly stipend was $198.33.

B. <u>Labor Commissioner Proceedings and Appeal</u>

In July 2020, Lorenzo filed a claim with the Labor Commissioner for wage-and-hour violations. Her complaint alleged that she was owed regular and overtime wages, meal period premium wages, as well as liquidated damages for the work she performed at the Center. Following a hearing, the Labor Commissioner issued an order, decision, or award (Order or Labor Commissioner Order) in Lorenzo's favor against all three defendants. As to Galijan and Smith, the Commissioner held that they were individually liable under section 558.1 because they "were in charge of all three facilities at some point and made decisions as to how the facilities were" run. The total amount awarded against defendants was $149,177.15, which consisted of unpaid minimum wages, unpaid overtime wages, liquidated damages, interest, and waiting time penalties.

Defendants timely appealed the Order, resulting in a de novo action in the trial court.[2] To perfect its appeal, the Center posted an undertaking in

---

[2] This de novo appeal " 'is neither a conventional appeal nor review of the Labor Commissioner's decision, but is rather a de novo trial of the wage dispute' [citation], and the [trial] court ' " 'hears the matter, not as an appellate court, but as a court of original jurisdiction, with full power to hear

the full amount awarded in the Order pursuant to section 98.2. Under its terms, however, that undertaking did not include Galijan or Smith. As a result, the Labor Commissioner, on behalf of Lorenzo, filed a motion to dismiss Galijan's and Smith's appeals on the grounds that they failed to post an undertaking as required by section 98.2, subdivision (b). The court denied the motion, finding that Lorenzo's "putative employer has posted [an] undertaking" in the full amount.

C. Motion for Summary Judgment

Defendants moved for summary judgment, contending that the ministerial exception of the First Amendment, an affirmative defense, barred Lorenzo's wage claims. They relied primarily on *Alcazar v. Corp. of Catholic Archbishop of Seattle* (9th Cir. 2010) 598 F.3d 668 (*Alcazar I*), affirmed in part and vacated in part in *Alcazar v. Corp. of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288 (*Alcazar II*), a case in which the Ninth Circuit held that the ministerial exception barred a minister's minimum wage claims against his religious employer. In opposition, Lorenzo argued that the United States Supreme Court has only "recognized [that] the ministerial exception exempts religious organizations from antidiscrimination laws in the context of hiring and firing their ministers." Lorenzo also pointed to *Tony and Susan Alamo Foundation v. Secretary of Labor* (1985) 471 U.S. 290 (*Alamo*), a case in which the United States Supreme Court held that the Religion Clauses did not exempt religious organizations engaged in commercial activities from wage-and-hour laws.

The trial court granted defendants' motion. It concluded that the ministerial exception applied because WPAs like Lorenzo qualified as

---

and determine it *as if it had never been before the labor commissioner' " '* [citation]." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 65–66.)

6

ministers. It further reasoned that although the high court cases invoking the ministerial exception only "implicated wrongful termination claims against religious employers, applying wage-and-hour laws to WPAs would create the same judicial entanglement in religious issues the Supreme Court sought to avoid." Judgment was thereafter entered in favor of defendants. Lorenzo timely appealed.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate, and the moving party (typically, the defendant) is entitled to judgment as a matter of law, where (1) the defendant carries its initial burden of showing either the nonexistence of one or more elements of the plaintiff's claim or the existence of an affirmative defense, and (2) the plaintiff thereafter fails to show the 'existence of a triable issue of material fact' as to those elements or affirmative defense." (*Pereda v. Atos Jiu Jitsu LLC* (2022) 85 Cal.App.5th 759, 767; see Code Civ. Proc., § 437c, subds. (c), (o)(1) & (2).)

"The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established. Instead of merely submitting evidence to negate a single element of the plaintiff's cause of action, . . . 'the defendant has the initial burden to show that undisputed facts support *each element* of the affirmative defense' [citations]. The defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied." (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289–290 (*Anderson*).)

7

We review a grant of summary judgment de novo, which means we "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) In deciding whether a material issue of fact exists for trial, we "consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence." (Code Civ. Proc., § 437c, subd. (c).) We view the evidence in the light most favorable to the plaintiff, as the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

B. <u>The Ministerial Exception</u>

"The First Amendment provides, in part, that . . . 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' . . . Both Religion Clauses bar the government from interfering with the decision of a religious group to fire [or hire] one of its ministers." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 181.) This prohibition has been labeled "the ministerial exception."

The United States Supreme Court first recognized the ministerial exception in the context of a disability discrimination claim by a minister after the church fired her. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 188.) As the high court detailed at length, the exception is derived from the church autonomy doctrine under the Religion Clauses. (*Id*. at pp. 182–184.) Referencing its earlier decisions in *Watson v. Jones* (1871) 80 U.S. 679 and *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America* (1952) 344 U.S. 94 (*Kedroff*) (*Hosanna-Tabor,* at pp. 185–187), the court explained that the doctrine recognizes the " 'power [of religious organizations] to decide for themselves, free from state interference, matters

8

of church government as well as those of faith and doctrine' " (*id*. at p. 186, quoting *Kedroff*, at p. 116).  This includes the power " 'to select the clergy, where no improper methods of choice are proven . . . .' " (*Hosanna-Tabor*, at p. 186, quoting *Kedroff*, at p. 116.)

As historical support for the ministerial exception, the Supreme Court cited the "background" against which "the First Amendment was adopted." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 183.)  "Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church. . . .  By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown— would have no role in filling ecclesiastical offices." (*Id*. at pp. 183–184.)  To that end, "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." (*Id*. at p. 184.)

In *Hosanna-Tabor*, the Supreme Court extended this reasoning to "foreclose *certain* employment discrimination claims brought against religious organizations." (*Our Lady*, *supra*, 591 U.S. at p. 747, italics added.) "By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.  According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 188–189.)

In barring the plaintiff's discrimination claims based on her firing, the high court noted that it made no difference whether the church's religious

9

reason for firing a minister was pretextual because "[t]he purpose of the [ministerial] exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter '*strictly ecclesiastical,*' . . . is the church's alone." (*Hosanna-Tabor, supra,* 565 U.S. at pp. 194–195, italics added.) Thus, the church need not show that its decision to hire or fire a minister is rooted in any religious belief because the very nature of choosing a minister (and by extension, choosing the duties he or she performs) is inherently ecclesiastical.

The high court, however, expressly limited its holding in *Hosanna-Tabor* to "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." (*Hosanna-Tabor, supra,* 565 U.S. at p. 196.) In doing so, it "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." (*Ibid.*)

Almost a decade later, the United States Supreme Court revisited the ministerial exception. In *Our Lady*, the high court concluded that two Catholic school teachers qualified as ministers despite their lack of clerical titles or formal training (*Our Lady, supra*, 591 U.S. at pp. 758–759) because "they both performed vital religious duties," such as educating their students in the Catholic faith (*id.* at p. 756). Accordingly, the court held that the ministerial exception foreclosed the teachers' employment discrimination claims against their religious school employers based on their terminations. (*Id.* at pp. 738, 742, 745.)

10

In applying the ministerial exception, the Supreme Court reiterated its grounding in the church autonomy doctrine. "The constitutional foundation" for the exception is "the general principle of church autonomy[:] . . . independence in matters of faith and doctrine and in closely linked matters of internal government." (*Our Lady*, *supra*, 591 U.S. at p. 747.) The high court further emphasized that religious institutions must have "autonomy with respect to internal management decisions *that are essential to the institution's central mission.*" (*Id.* at p. 746, italics added.) One "component of this autonomy is the selection of the individuals who play certain key roles." (*Ibid.*) Indeed, "a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." (*Id.* at p. 747.)

From *Hosanna-Tabor* and *Our Lady*, the only two high court decisions that have addressed the ministerial exception, we can glean the following principles that will guide us here. Not every employment claim raised by a minister is barred by the exception. (See *Our Lady*, *supra*, 591 U.S. at p. 747 [ministerial exception bars only "certain employment discrimination claims"].) Instead, "the scope of the ministerial exception . . . is limited to what is necessary to comply with the First Amendment." (*Bollard v. California Province of the Society of Jesus* (9th Cir. 1999) 196 F.3d 940, 947 (*Bollard*).) And barring a minister's employment claim without any evidence that the claim would raise an ecclesiastical concern is necessary to comply with the First Amendment only if that claim will inevitably "thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine." (*Ibid.*) Thus, the ministerial exception only bars employment claims that *require* inquiries into matters that are " '*strictly* a matter of ecclesiastical government' " (*Hosanna-*

11

*Tabor*, *supra*, 565 U.S. at p. 186, italics added), such as "the authority to select, supervise, and . . . remove a minister" (*Our Lady*, at p. 747). It does not bar employment claims that "will have no significant impact on" a church's "religious beliefs or doctrines." (*Bollard*, at p. 947.)

    C.  <u>Application of the Ministerial Exception to Lorenzo's Claims</u>

Lorenzo contends that the ministerial exception should not have been extended to bar her wage-and-hour claims because the United States Supreme Court has only applied the exception to bar a minister's employment discrimination and wrongful termination claims. As a preliminary matter, Lorenzo concedes that the Center is a religious organization, regardless of whether it was engaged in commercial activity. She also concedes that she was a minister for purposes of the ministerial exception.[3] The only question then, is whether the exception bars her wage-and-hour claims despite the lack of any evidence that her claims raise an ecclesiastical concern. We conclude that it does not.

Although religious organizations enjoy autonomy in "matters of 'faith and doctrine' " and " ' "church government," ' " they do not "enjoy a general immunity from secular laws." (*Our Lady, supra,* 591 U.S. at p. 746.) "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." (*Alamo, supra,* 471 U.S. at p. 303.)

---

[3] *Behrend v. San Francisco Zen Center, Inc.* (9th Cir. 2024) 108 F.4th 765 is therefore inapposite. In that case, the plaintiff was a WPA and filed a claim for disability discrimination after the Center terminated his employment. As a result, the only issue before the Ninth Circuit was whether he qualified as a minister for purposes of the ministerial exception. (*Id*. at pp. 767–768.) *Behrend* also did not involve any wage-and-hour claims.

In *Alamo*, the United States Supreme Court considered whether applying minimum wage and recordkeeping laws to workers engaged in a religious entity's commercial activities violated the entity's right "to be free of excessive government entanglement in its affairs." (*Alamo, supra*, 471 U.S. at p. 303.) The high court held that it did not, concluding that the entity's commercial activities "are not beyond the reach of the Fair Labor Standards Act." (*Id*. at p. 306.) In reaching this conclusion, the court reasoned that minimum wage and recordkeeping requirements "have no impact on [the entity's] own evangelical activities" and would not "pose an intolerable risk of government entanglement with religion." (*Id*. at p. 305.)

Neither *Hosanna-Tabor* nor *Our Lady* overruled *Alamo*. Nonetheless, the Center contends that *Alamo* did not add any burden requirement to the ministerial exception. The Center is correct because the ministerial exception was not at issue in *Alamo*. But the high court in *Alamo* did consider whether the enforcement of minimum wage laws against a religious entity engaged in commercial activities would result in excessive government entanglement with religion under the church autonomy doctrine and concluded that it would not. (*Alamo, supra*, 471 U.S. at pp. 304–305.)

Like the plaintiffs in *Alamo*, Lorenzo only challenges the Center's failure to pay her a minimum wage and overtime wages for work that she has already performed as part of the Center's commercial activities. She does not challenge the Center's decision to terminate her employment or seek reinstatement. Despite this, the Center asserts that the enforcement of California's wage-and-hour laws would inevitably result in excessive entanglement with religion in violation of the Religion Clauses solely because Lorenzo is a minister. But the Center does not explain why, and its omission is telling.

13

As Justice Edmon explained in her concurring opinion in *Su v. Stephen S. Wise Temple* (2019) 32 Cal.App.5th 1159, 1175 (*Su*), the ministerial exception does not bar an employment claim "simply because the person on whose behalf a suit is brought is a minister . . . ." (See also *Bollard, supra,* 196 F.3d at p. 947 ["it strays too far from the rationale of the Free Exercise Clause to extend constitutional protection to this sort of disciplinary inaction simply because a minister is the target as well as the agent of the harassing activity"].) This is because "the aspect of the church-minister employment relationship that warrants heightened constitutional protection—a church's freedom to choose its representatives"—is not "present" in every employment claim. (*Ibid.*) For example, not every aspect of a minister's compensation is "an internal church decision that affects the faith and mission of the church itself." (*Hosanna-Tabor, supra,* 565 U.S. at p. 190.) Indeed, "[t]he constitutional rationale for protecting some of a church's [autonomy to choose its representatives] . . . does not apply . . . where what is at issue is not *who* the [church] will select to educate its youngest students, but only whether it will provide the people it has chosen with meal breaks, rest breaks, and overtime pay." (*Su*, at p. 1175.) Thus, the ministerial exception—which only protects decisions that are " '*strictly* a matter of ecclesiastical government' " (*Hosanna-Tabor*, at p. 186, italics added)— cannot bar every claim over a minister's compensation.

A contrary conclusion would be problematic to say the least. For example, religious leaders who have fraudulently compensated themselves at their church's expense should not get a free pass through the ministerial exception. As Judge Bress observed in his concurring opinion in *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints* (9th Cir. 2025) 127 F.4th 784, 798, footnote 2 (*Huntsman*), "the church

14

autonomy doctrine would not immunize religious leaders from fraudulently enriching themselves under the guise of religion." Likewise, a minister's claim for unpaid wages pursuant to an employment contract should not be barred without any evidence of a "religious justification for" the breach (*Bollard, supra*, 196 F.3d at p. 947) because her religious employer already approved those wages when it agreed to the contract (see *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau* (D.C. 2012) 49 A.3d 812, 817 (*Prioleau*) [ministerial exception did not bar contract claim for unpaid wages because "[t]he record . . . does not suggest that resolving [the minister's] contract claim will require the court to entangle itself in church doctrine"]).

Indeed, at least one Court of Appeal has recognized that a breach of contract action by a minister, even though it involves the church-minister relationship, is not barred by the ministerial exception. In *Sumner*, the Court of Appeal held that the ministerial exception did not categorically bar the plaintiff's action for breach of her written employment agreement following her termination by her religious employer for insubordination. (*Sumner, supra*, 27 Cal.App.5th at p. 593.) In support of this holding, the court found that the resolution of the contract claim "does not require a review of [the plaintiff's] religious qualification or performance as a religious leader." (*Ibid.*) In other words, the plaintiff's claim did not inevitably raise a matter of ecclesiastical concern. The court also reasoned that the "[d]efendants voluntarily circumscribed their own conduct by entering into the contract with [the plaintiff], and the contract can [therefore] be enforced without breaching the institution's religious autonomy." (*Id.* at p. 593.)

By declining to apply the ministerial exception to bar a minister's claim for breach of an employment agreement, *Sumner* joined our many sister

15

courts that have done the same.  (See, e.g., *Jenkins v. Refuge Temple Church of God in Christ, Inc.* (S.C.Ct.App. 2018) 818 S.E.2d 13, 18 ["the parties in this case are not asking this court to resolve an employment discrimination [dispute] . . ., but rather to determine the validity of a contract"]; *Kirby v. Lexington Theological Seminary* (Ky. 2014) 426 S.W.3d 597, 615 ["the enforcement of the contractual arrangement between the Seminary and [plaintiff] does not arouse concerns of government interference in the selection of ministers"]; *Prioleau, supra,* 49 A.3d at p. 817 ["[t]he record . . . does not suggest that resolving [the plaintiff's] contract claim will require the court to entangle itself in church doctrine"].)

Lastly, the Center has not pointed to and we have not come across anything in the history of the Religion Clauses to suggest that a minister's *compensation*, much less the minimum compensation that a minister should receive to subsist, was a concern of the founders.  (See, e.g., McConnell, *The Origins and Historical Understanding of Free Exercise of Religion* (1990) 103 Harv. L.Rev. 1409.)  By contrast, there is ample evidence that protecting a church's selection of its ministers was of central importance to our founders. (*Hosanna-Tabor, supra*, 565 U.S. at p. 184 ["then-Secretary of State [James] Madison responded that the selection of church 'functionaries' was an 'entirely ecclesiastical' matter left to the Church's own judgment" and that "[t]he 'scrupulous policy of the Constitution in guarding against a political interference with religious affairs' . . . prevented the Government from rendering an opinion on the 'selection of ecclesiastical individuals' "].)

Thus, the ministerial exception does not bar every employment claim for lost or unpaid wages.  Instead, it only bars those claims that necessarily require an inquiry into matters of a religious entity's "internal government" that are "closely linked" to the entity's "faith and doctrine."  (*Our Lady*,

*supra*, 591 U.S. at p. 747.) The Center does not argue that, much less explain how, Lorenzo's wage-and-hour claims—which only seek lost or unpaid wages for her work in the Church's *commercial* activities—require such an inquiry. (Cf. *Alamo*, *supra*, 471 U.S. at p. 305 [applying wage recordkeeping requirements "to commercial activities undertaken with a 'business purpose' . . . would . . . have no impact on petitioners' own evangelical activities"].) Instead, the Center concedes in its opening brief that Lorenzo "is correct that '[a]djudication of this case does not require the Court to resolve any ecclesiastical questions.' " We therefore conclude that the exception does not bar Lorenzo's claims. (See *Bollard*, *supra*, 196 F.3d at p. 947 [rejecting the application of the ministerial exception because the religious entity's "disavowal of the harassment . . . reassures us that application of Title VII in this context will have no significant impact on their religious beliefs or doctrines"].)

In doing so, we join our sister courts that have refused to apply the ministerial exception to bar enforcement of their wage-and-hour laws. (See, e.g., *Bigelow v. Sassafras Grove Baptist Church* (N.C.Ct.App. 2016) 786 S.E.2d 358, 366 [former pastor's employment "claims, rather than asking the court to address ecclesiastical doctrine or church law, require the court only to make a secular decision . . . to apply the neutral principles of the Wage and Hour Act"]; *Mundie v. Christ United Church of Christ* (Pa.Super.Ct. 2009) 987 A.2d 794, 798 ["the First Amendment does not exempt religious institutions from laws that regulate the minimum wage or the use of child labor, even though both involve employment relationships"].)

D. The Ninth Circuit Cases

As the Center correctly points out, a series of Ninth Circuit decisions have applied the ministerial exception to bar wage-and-hour claims by

17

ministers. Of course, we are not bound by those decisions, even though they are "entitled to great weight." (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320.) Indeed, we have not hesitated to reject Ninth Circuit decisions in the past when we have not found their reasoning persuasive. (See, e.g., *People v. Mackey* (2015) 233 Cal.App.4th 32, 87 ["we disagree with the Ninth Circuit's test and are not bound to follow it, even on constitutional questions"].) We do so again here because the Ninth Circuit has provided little or no analysis to support its overly broad interpretation of the ministerial exception.

In *Markel v. Union of Orthodox Jewish Congregations of America* (9th Cir. 2024) 124 F.4th 796 (*Markel*), the Ninth Circuit held that the ministerial exception "encompasses *all* adverse personnel or tangible employment actions between religious institutions and their employees and disallows lawsuits for damages based on lost or reduced pay." (*Id.* at p. 803, italics added.) In support, the Ninth Circuit proffered no explanation for its broad interpretation of the exception. Instead, it simply cited to its prior en banc decision in *Alcazar II.* (*Markel*, at p. 803.)

Meanwhile, *Alcazar II* merely adopted, "in all . . . respects," the portion of the three-judge panel's decision "holding that the [ministerial] exception applies to the minimum-wage claim at issue." (*Alcazar II, supra*, 627 F.3d at p. 1290.) The panel's decision, in turn, relied primarily on a quote from *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553 (*McClure*), the first published case to articulate the ministerial exception, to justify its application of the exception to bar the plaintiff's minimum wage claim. (See *Alcazar I, supra*, 598 F.3d at p. 674.)

But *McClure*, like *Hosanna-Tabor* and *Our Lady*, involved only claims for employment discrimination and wrongful termination. The plaintiff in

18

*McClure*, a minister employed by the Salvation Army, filed a Title VII action against the organization, alleging that "she had received less salary and fewer benefits than that accorded similarly situated male officers" and was "discharged because of her complaints to her superiors and the Equal Employment Opportunity Commission." (*McClure, supra,* 460 F.2d at p. 555.) As for remedies, "[s]he sought reinstatement, an injunction against further discriminatory practices, and a judgment for the alleged deficiency in compensation paid to her as compared to male Salvation Army officers whose responsibilities were equivalent to those she performed." (*Ibid.*)

In barring the plaintiff's claims under the Religion Clauses, the Fifth Circuit first reasoned that the Salvation Army's selection of its ministers "is a matter of church administration and government" and is "of prime ecclesiastical concern." (*McClure, supra,* 460 F.2d at p. 559.) It then extended that reasoning to "functions which accompany such a selection," including "*the determination of a minister's salary*, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." (*Ibid.*, italics added.) *McClure*'s bar on certain employment claims by a minister became what is now known as the ministerial exception.

Even assuming that the Fifth Circuit correctly applied that bar in *McClure*, we do not agree that *McClure* establishes that claims for minimum and overtime wages are barred by the ministerial exception. First, *McClure* did not involve any wage-and-hour claims. Second, the resolution of the plaintiff's claim for lost or unpaid wages in *McClure*—"the alleged deficiency in compensation paid to her as compared to" her male counterparts (*McClure, supra,* 460 F.2d at p. 555)—would require a review of the Salvation Army's differential treatment of its male and female ministers,

19

including any differing duties and responsibilities.  This would, in turn, require a review of "internal management decisions that are essential to the [religious] institution's central mission."  (*Our Lady*, *supra*, 591 U.S. at p. 746.).  The same is not true of Lorenzo's minimum wage claims.[4]

*Elvig v. Calvin Presbyterian Church* (9th Cir. 2004) 375 F.3d 951, the other Ninth Circuit decision applying the ministerial exception to bar a minister's employment claims for compensation, is also distinguishable.  In *Elvig*, the plaintiff alleged claims for sexual harassment and retaliation against her church employer after it fired her for complaining about that harassment.  (*Id*. at p. 965.)  The Ninth Circuit concluded that "to the extent [the plaintiff's] sexual harassment and retaliation claims implicate the Church's ministerial employment decisions, those claims are foreclosed." (*Id*. at p. 953.)  The Ninth Circuit further reasoned that because "the termination of [the plaintiff's] ministry and her inability to find other pastoral employment are consequences of protected employment decisions. . . .  [A] damage award based on lost or reduced pay [she] may have suffered from those employment decisions would necessarily trench on the Church's protected ministerial decisions."  (*Id*. at p. 966.)

By contrast, Lorenzo's wage-and-hour claims are not tied to the Center's decision to terminate her employment and do not invade the

---

[4] For example, any analysis of a religious entity's justifications for the differential pay received by its male and female ministers necessarily requires an inquiry into the different roles and duties that the entity assigned to its ministers as well as the reasons for those assignments.  Thus, the Fifth Circuit in *McClure* reasonably concluded that any "determination of a minister's salary" required to resolve the plaintiff's discrimination claims based on differentials in pay were "of prime ecclesiastical concern." (*McClure, supra,* 460 F.2d at p. 559.)  By contrast, minimum wage or overtime claims do not necessarily require any similar inquiries into "matters of church government."  (*Kedroff, supra*, 344 U.S. at p. 116.)

20

Center's autonomy in the selection of its ministers. (Cf. *Huntsman, supra,* 127 F.4th at p. 792 [fraud claim regarding the church's use of tithing funds did not require the court to "delve[] into matters of Church doctrine or policy" and therefore "does not run afoul of the church autonomy doctrine"].) Indeed, Lorenzo is only seeking the amount of wages for her work in furtherance of the Center's commercial activities that the Legislature has deemed minimally necessary for her to subsist. (See *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 952 ["The basic objective of wage[-]and[-]hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare"].) We do not see why the Center's refusal to pay this subsistence wage should *always* be deemed a purely ecclesiastical matter and should therefore be subject to the ministerial exception.

Accordingly, we decline to follow *Markel*'s holding that the ministerial exception bars "*all* adverse personnel or tangible employment actions between religious institutions and their employees." (*Markel, supra*, 124 F.4th at p. 803, italics added.) Neither *Hosanna-Tabor* nor *Our Lady* supports such an expansive interpretation of the exception. And we find no reasoned basis for expanding that exception to bar *all* wage-and-hour claims even if there is no evidence that the adjudication of those claims would infringe on matters of "internal governance" protected by the Religious Clauses. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 188.)

E. The Church Autonomy Doctrine

We next address the parties' arguments regarding the church autonomy (or ecclesiastical abstention) doctrine. Their arguments are

21

somewhat difficult to decipher because they appear to argue past each other. Moreover, the parties appear to agree that the doctrine does not bar Lorenzo's wage-and-hour claims. Lorenzo argues that the trial court should have applied the church autonomy doctrine, rather than the ministerial exception, and "conclude[d] that resolving this minimum wage claim presents no questions as to [the Center's] religious doctrine or ecclesiastical governance.'" The Center counters that Lorenzo's "[r]eliance" on that doctrine is "[w]aived, [i]rrelevant, and [i]napplicable." (Boldface omitted.) But in doing so, the Center appears to concede that the doctrine does not bar her claims. Thus, our discussion of the church autonomy doctrine could arguably end here. Nonetheless, we briefly discuss the doctrine to make clear that the inapplicability of the ministerial exception does not foreclose a challenge to Lorenzo's wage-and-hour claims under the Religion Clauses.

The ministerial exception is an example of a specific application of the church autonomy doctrine. (See *Huntsman*, *supra*, 127 F.4th at p. 797 (conc. opn. of Bress, J.) [citing *Our Lady* and *Hosanna-Tabor* as "[t]he most notable example[s] in recent years" of the application of the church autonomy doctrine].) That doctrine "protects First Amendment values by prohibiting courts from resolving 'controversies over religious doctrine and practice.'" (*Huntsman*, at p. 792.) Before the doctrine may be applied, " 'a threshold inquiry is whether the alleged misconduct is "rooted in religious belief." ' " (*Tucker v. Faith Bible Chapel Internat.* (10th Cir. 2022) 36 F.4th 1021, 1029 (*Tucker*).) In this respect, the church autonomy doctrine differs from the ministerial exception even though the exception is "based on" that doctrine. (*Our Lady*, *supra*, 591 U.S. at p. 746.) Indeed, the doctrine is both narrower and broader than the exception. The doctrine applies more narrowly "because [the exception] applies regardless of whether the dispute is rooted

22

in religious belief . . . ." (*Tucker*, at p. 1029.) But the doctrine also applies more broadly because the exception "applies . . . only to *employment discrimination claims* asserted by a <u>minister</u>." (*Ibid.*, italics added.)

With this distinction in mind, we reject the Center's contention that Lorenzo waived her argument that the trial court should have but failed to engage in the threshold inquiry described above. Consistent with the Center's apparent concession, we further conclude that, in light of the inapplicability of the ministerial exception, the Center has not met its burden of establishing an affirmative defense under the Religious Clauses.

As a threshold matter, we find no waiver. In opposing summary judgment, Lorenzo argued that the Center was required to show that complying with wage-and-hour laws would violate either the Free Exercise or Establishment Clauses in order to prevail. This was sufficient to preserve Lorenzo's argument on appeal, which expands upon what she argued below. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1322, fn. 9 ["Defendant's challenge on appeal is merely a constitutional 'gloss' upon an objection raised below, and therefore is not forfeited"].)

Turning to the merits, we agree with Lorenzo that, if the ministerial exception does not apply, the Center bears the burden of showing that based on the affirmative defense of the church autonomy doctrine, Lorenzo's wage-and-hour claims raise an ecclesiastical concern such that they are barred under the Religious Clauses. (*Tucker, supra,* 36 F.4th at p. 1029.) We also agree, consistent with the Center's apparent concession (see, *ante,* at p. 22), that the Center has not met that burden here. (See *Anderson, supra*, 72 Cal.App.4th at pp. 289–290 [summary judgment based upon an affirmative defense is a heavy burden and "[t]he defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial"].) This is so

23

even though work practice, as the Center asserted at oral argument, constitutes a critical component of Zen training and practice. We found, and the Center identified, nothing in the record even suggesting that the *amount* of compensation given to a WPA or staff implicates an ecclesiastical concern.

Of course, our ruling here today does not foreclose the Center from presenting evidence at trial that applying wage-and-hour laws to ministers like Lorenzo raises an ecclesiastical concern and should therefore be barred under the Religion Clauses.[5] As Justice Edmon explained in *Su,* "in appropriate cases, the First Amendment may well compel an exemption from [wage-and-hour] laws to avoid ' "trench[ing] on [a] Church's protected ministerial decisions." ' " (*Su, supra,* 32 Cal.App.5th at p. 1176.) But "to avoid claims of wage-and-hour violations . . ., a religious employer must demonstrate that applying the wage-and-hour laws to its ministers violates either the [F]ree [E]xercise [C]lause or the [E]stablishment [C]lause." (*Ibid.*) It cannot simply invoke the ministerial exception based on its status as a religious institution and its employee's status as a minister.

F.  Posting an Undertaking

Lastly, Lorenzo argues that the trial court erred in denying her motion to dismiss Galijan's and Smith's de novo appeals of the Labor Commissioner Order to the trial court because they failed to post the undertaking required by section 98.2. Applying the well-established canons of statutory construction and focusing particularly on the words and purposes of the relevant statutes (see *T.M. v. Superior Court* (2024) 104 Cal.App.5th 664, 680–681 (*T.M.*)), we agree.

_____

[5] For example, in *Schleicher v. Salvation Army* (2008) 518 F.3d 472, 476, Judge Posner hypothesized that the Religion Clauses would bar wage-and-hour claims by monks who have taken a vow of poverty, "a hallowed religious observance." No such showing was made here by the Center.

24

Section 98.2, subdivision (b), provides that "[a]s a condition to filing an appeal" of a Labor Commissioner's order to the trial court, "an *employer* shall first post an undertaking with the reviewing court in the amount of the order, decision, or award." (Italics added.) This requirement "is mandatory and jurisdictional, and . . . the court has no authority to extend the deadline for posting the undertaking beyond the [10-day] deadline for filing the notice of appeal." (*Palagin v. Paniagua Construction, Inc.* (2013) 222 Cal.App.4th 124, 140 (*Palagin*).)

The purpose of the undertaking requirement " 'is to discourage employers from filing frivolous appeals and from hiding assets in order to avoid enforcement of the judgment.' " (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1129.) Moreover, "recognizing the underlying requirements to be jurisdictional furthers the broader purposes of the statutory scheme. By precluding an employer from even filing a notice of appeal without an undertaking, the employee does not have to expend time and money in procuring a dismissal or enduring trial de novo proceedings pending the ruling, thus furthering the purpose of 'reduc[ing] the costs and risks of pursuing a wage claim,' 'deter[ring] employers from unjustifiably prolonging a wage dispute by filing an unmeritorious appeal,' and ultimately 'ensuring that workers are paid wages owed.' " (*Palagin, supra,* 222 Cal.App.4th at p. 137.)

As an initial matter, we reject the Center's argument that section 98.2's undertaking requirement was satisfied because it posted an undertaking in the full amount of the Order. According to the Center, Lorenzo's "absurd interpretation" would require an undertaking of three times that amount. But Lorenzo never made any such interpretation. She only asserts that the three defendants "could have posted one joint and several bond in the [full]

25

amount" to satisfy the requirements of section 98.2, subdivision (b), but failed to do so.

Turning to the question of whether Galijan and Smith had to post an undertaking in order to appeal, we start by noting that section 98.2, subdivision (b), by its express terms, requires that *each* "employer" post an undertaking "[a]s a condition to filing an appeal" from a Labor Commissioner's order. Thus, if Galijan and Smith are each deemed "an employer" for purposes of section 98.2, subdivision (b), then they *each* had to post an undertaking covering the amount of the award in order to appeal from the portion of the Order adverse to them.

We further note that the Labor Commissioner found Galijan and Smith individually liable for the full amount awarded to Lorenzo under section 558.1. Subdivision (a) of that section provides that "[a]ny employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, may be held liable *as the employer* for such violation."[6] (Italics added.) "By making certain individuals such as . . . directors, officers, and managing agents [like Galijan and Smith] personally liable, the Legislature sought to ' "discourage [such individuals] from rolling up their operations and walking away from their debts to workers and starting a new company." ' " (*Usher v. White*

---

[6] The remaining two subdivisions of section 558.1 state in full: "(b) For purposes of this section, the term 'other person acting on behalf of an employer' is limited to a natural person who is an owner, director, officer, or managing agent of the employer, and the term 'managing agent' has the same meaning as in subdivision (b) of Section 3294 of the Civil Code. [¶] (c) Nothing in this section shall be construed to limit the definition of employer under existing law."

26

(2021) 64 Cal.App.5th 883, 894 (*Usher*).) Defendants do not dispute that the Labor Commissioner found Galijan and Smith liable under section 558.1. Nor do they dispute in their appellate briefs or below that Galijan and Smith are each liable under section 558.1 as "the employer." They therefore forfeited any argument that Galijan and Smith were not "employer[s]" for purposes of their wage-and-hour violations. (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 920, fn. 3 [the plaintiff forfeits an argument by not raising it in the trial court].)

Because Galijan and Smith were each found liable as "the employer" under section 558.1, they each should logically be deemed "an employer" for purposes of section 98.2, subdivision (b). (See *People v. Roberge* (2003) 29 Cal.4th 979, 987 [" ' " ' "identical words used in different parts of the same act are intended to have the same meaning" ' " ' "].) They were both therefore required to post an undertaking in order to appeal from the Order. (§ 98.2, subd. (b).) But the undertaking posted by the Center, by its express terms, did *not* include Galijan or Smith. (See *G & W Warren's, Inc. v. Dabney* (2017) 11 Cal.App.5th 565, 574 [" 'surety cannot be held beyond the express terms of [its] contract' "].) Defendants offer no explanation for this omission. Nor do they explain how their posted undertaking would cover Galijan or Smith, if they, but not the Center, are somehow found liable. As Lorenzo points out, defendants do not even allege that there was any agreement among them or with the licensed surety that the Center's undertaking would cover Galijan and Smith at the time the undertaking was posted. Where, as here, a notice of appeal is filed jointly by multiple defendants but the undertaking is only provided on behalf of one of those defendants, the appeals of the other defendants must be dismissed. (*Zane v. De Onativia* (1902) 135 Cal. 440, 441–442.)

*Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, a case mentioned by the Center for the first time at oral argument, does not compel a contrary conclusion. In concluding that an individual may be held liable for "civil penalties" as "a person *other than the employer*" (*id.* at p. 823), *Atempa* did not consider the language of section 558.1. Instead, *Atempa* only construed the language of sections 558, subdivision (a), and 1197.1, subdivision (a). (*Atempa*, at p. 824.) This is significant because neither of those statutes makes an individual "liable as the employer" like section 558.1, subdivision (a).[7] (See §§ 558, subd. (a), 1197.1 subd. (a).) In other words, sections 558 and 1197.1 do *not* define a liable individual as the employer. By contrast, section 558.1 does. *Atempa* therefore does not help the Center here.

In holding that we and the trial court lack jurisdiction over Galijan's and Smith's appeals from the Order, we adhere to the purposes behind both sections 98.2 and 558.1. (See *T.M.*, *supra*, 104 Cal.App.5th at p. 682 [construing statute in light of "the ' "ostensible objects to be achieved" ' "].) By requiring individuals who are found liable under section 558.1 to post an undertaking in order to appeal, we further the purpose behind section 98.2 by reducing the risks and costs of litigation to vulnerable workers, deterring unmeritorious appeals, and ensuring that workers get paid the wages they are owed. (See *Palagin*, *supra*, 222 Cal.App.4th at p. 137.) We also further

---

[7] Section 558, subdivision (a), states in relevant part: "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission *shall be subject to a civil penalty . . . .*" (Italics added.) Similarly, section 1197.1, subdivision (a), states in relevant part: "Any employer or other person acting either individually or as an officer, agent, or employee of another person, who pays or causes to be paid to any employee a wage less than the minimum fixed by an applicable state or local law, or by an order of the commission, *shall be subject to a civil penalty . . . .*" (Italics added.)

28

the purpose behind section 558.1 by discouraging those individuals from "'"walking away from their debts to workers and starting a new company."'" (*Usher*, *supra*, 64 Cal.App.5th at p. 894.)

Indeed, a contrary holding would frustrate the objectives of both statutes. For example, if individuals found liable under section 558.1 are not subject to the undertaking requirement, then there may be an appeal from a Labor Commissioner's order with no bond to cover the employer's potential liability because the employing entity may be judgment proof and therefore choose not to appeal. In that situation, the appeal would increase the costs for vulnerable workers without any repercussions for the individuals already found liable under section 558.1. Moreover, the risk of nonrecovery by those workers would increase dramatically because those individuals would have greater opportunity to hide their assets during the appeal. This is exactly the type of situation that the Legislature intended to prevent by adopting sections 98.2 and 558.1.

Accordingly, we reverse the denial of Lorenzo's motion to dismiss the appeals filed by Galijan and Smith. In doing so, we also reverse the judgments for Galijan and Smith on the separate ground that the trial court lacked jurisdiction to hear their appeals due to their failure to post the undertaking required by section 98.2, subdivision (b).

### III. <u>DISPOSITION</u>

We reverse the judgment and the trial court's grant of summary judgment for defendants. We also reverse the court's denial of Lorenzo's motion to dismiss the de novo appeals of Galijan and Smith. Because both individuals failed to post the undertaking required by section 98.2, subdivision (b), the court lacked jurisdiction to hear their appeals.

29

CHOU, J.

We concur.

SIMONS, Acting P. J.
BURNS, J.


A171659/ *Lorenzo v. San Francisco Zen Center et al.*

Trial Court:        Superior Court of the City and County of San Francisco

Trial Judge:        Rochelle C. East

Counsel:        Department of Industrial Relations, Division of Labor Standards Enforcement, Annette D. Kirkham and Theresa Johnson Bichsel, for Plaintiff and Appellant.

                        Clarkson Law Firm, Brent A. Robinson and Glenn A. Danas for California Employment Lawyers Association and National Employment Law Project as Amici Curiae on behalf of Plaintiff and Appellant.

                        Foley & Lardner, Eileen R. Ridley, Sara Alexis Levine Abarbanel, Evan L. Hamling, Jack R. Doti, for Defendants and Respondents.